CRAVEN COUNTY v. FIRST-CITIZENS BANK & TRUST COMPANY, INC.

(Filed 15 April, 1953.)

**1. Deeds § 16b—**

Where land within a given area is developed in accordance with a general plan or uniform scheme of restriction, ordinarily anyone purchasing in reliance on the restrictions may sue and enforce the restrictions against any other lot owner taking with record notice, regardless of whether he was an earlier or later purchaser, upon the principle that such restrictions create servitudes upon each lot in favor of each of the rest of the lots in the restricted area, which servitudes amount to negative easements constituting an interest in land.

**2. Same—**

To be effective, restrictive covenants must be part of a general plan or scheme of development which bears uniformly upon the area affected.

**3. Same—**

Where the developer imposes restrictions in accordance with a plan of development by separate, distinct divisional units within the larger area, rather than a single development project, effect will be given to the restrictive covenants only as they relate to each separate unit.

**4. Same—**

Restrictive covenants, being in derogation of the free and unfettered use of land, will be strictly construed in favor of the unrestricted use of the property.

**5. Same—**

The developers of land registered a map showing a part of same subdivided into lots with a contiguous tract not subdivided. *Held:* Whether the developers treated and dealt with the two areas as a single unit and intended the restrictive easements to cover both tracts or whether the two areas were dealt with as separate, independent units, with intent of the developers and purchasers that the restrictions imposed be limited to the subdivided area, is to be gathered from the terms of the covenants and related facts appearing in the chain of title, and may not be established by parol.

**6. Same—**

The related facts appearing of record in the chain of title of the land in question, including deeds and maps, conveyances and trusts, judgments of sale and confirmation, *is held* to disclose that the restrictive covenants were intended to apply only to one area of the tract subdivided into lots in the registered map, and not to a contiguous tract designated to be conveyed as a whole or in parcels.

**7. Same—**

Where all of the land embraced within an area developed as a unit is conveyed to one person by deed containing a restrictive covenant, there is no dominant tenement upon which the covenant can rest, and therefore it stands only as a personal covenant between the parties and does not run with the land.

**8. Same: Receivers § 11—**

A receiver is without authority to impose restrictive covenants upon the land of the insolvent sold by him under order of court when the land was under no such restrictions in the hands of the insolvent and the order of court does not authorize the imposition of such restrictions.

**9. Deeds § 16b: Trusts § 14a—**

Where a trust deed authorizing the trustee to sell certain lands does not authorize the trustee to impose restrictive covenants in the deeds to the grantees, the trustee is without authority to impose such restrictive covenants.

**10. Deeds § 16b—**

Where the grantee in a deed containing an invalid restrictive covenant sells same by deed containing no reference to or mention of the covenant, such noninclusion of the covenant and silence of the parties in respect thereto works an effective abandonment and disavowal of the provisions of the covenant, and therefore cannot have the effect of activating the invalid restrictions.

**11. Municipal Corporations § 24—**

G.S. 160-59 requiring public notice of the sale of real estate belonging to a municipality has no application to actual partition of land in which a municipality owns an interest, since actual partition between tenants in common involves no sale or disposal of land or any interest therein, but merely severs the unity of possession.

**12. Trusts § 13—**

　　Where the instrument confers no duty as such upon the trustee, the deed
creates a passive trust, and by operation of law the legal as well as the
equitable title vests in the beneficiary.　G.S. 41-7.

APPEAL by defendant from *Stevens, J.,* holding the courts of the Fifth
Judicial District, at Chambers in Snow Hill, 23 February, 1953.　From
CRAVEN.

Suit for specific performance instituted and pending in Craven County,
submitted to Judge Stevens at the February Term, 1953, of Greene, on
waiver of jury trial and agreed statement of facts.　It was stipulated that
the case should be heard and judgment rendered out of the county and
out of term.

From the fifty-page statement of facts agreed we glean these facts as
being controlling:

1. On 15 December, 1952, the plaintiff, Craven County, exposed to
public sale the tract of land described in the complaint.　We omit the
detailed description as not being pertinent to decision.　It suffices to note
that the land involved is located at the north end of the block which lies
east of Fort Totten Drive, as shown on both accompanying maps.　On
Map No. 1 this area, containing 7.3 acres, is designated as "Jones and
Meadows Land"; on Map No. 2 as "Fort Totten."　The parcel in contro-
versy embraces approximately the northern third of this 7.3 acre area
and includes practically all of Block "10" as shown on Map No. 2.

2. At the sale the defendant, First-Citizens Bank & Trust Company,
became the highest bidder at the price of $40,000, and agreed in writing
with the plaintiff to purchase the land at that price, provided the "land
may be lawfully used for business purposes."　The plaintiff tendered deed
sufficient in form to vest in the defendant fee-simple title to the property.
The defendant refused tender, alleging the title offered to be defective.
The pertinent facts respecting the dispute as to title follow.

3. In April, 1925, E. H. Meadows and wife and Mrs. Julia B. Jones
by separate deeds conveyed to The National Bank of New Berne (herein-
after designated the Bank) two contiguous tracts of land near the western
limits of the City of New Bern, embracing the lands shown on the maps.
The conveyances were made to the Bank for the purpose of facilitating
the development of a residential suburb of the City of New Bern.　The
Bank, on the same day the deeds were made, executed an instrument in
the nature of a declaration of trust under which E. H. Meadows, Mrs.
Julia B. Jones, Fort Totten, Inc., and others were the beneficiaries of the
trust therein declared.　The trust agreement was not registered.　It was
later withdrawn and another instrument was substituted for it as herein-
after shown.

4. Thereafter a portion of the land, comprising some 40 or 45 acres, was surveyed out and subdivided into streets and into lots of an approximate uniform frontage of 25 feet in width and a depth of 160 feet. A map was made showing the lands so subdivided, copy of which, marked "Map No. 1," appears herewith, page 506. It is noted that this map also included an area of about 7.3 acres which was not subdivided. This area, located along the eastern side of the lands, is shown on the map as being open acreage. It is designated on this map as "Jones and Meadows Land." It includes the land at and around the site of Fort Totten (thrown up by the Federal Forces after the Battle of New Bern to guard the two land approaches into New Bern, namely: Neuse Boulevard on the north, and Trent Road on the south).

5. The main body of the subdivided area lies west and north of this 7.3 acre area (hereinafter referred to as Fort Totten). The Fort Totten area was left in open acreage. The two areas are separated by Fort Totten Drive, which runs in a general north-south course.

6. On 6 November, 1926, a substitute trust agreement was executed by the Bank and the interested beneficiaries superseding the unregistered declaration of trust executed in April, 1926. A copy of Map No. 1 showing the subdivided area and the Fort Totten open acreage area was attached to the substitute trust agreement and both were registered in the Public Registry of Craven County in Book 265, pp. 287 to 292.

7. This trust agreement, also in the nature of a declaration of trust, was executed by the Bank and the various beneficiaries of the trust (including Fort Totten, Inc., a corporation set up by the original developers to facilitate the promotion of the project). The pertinent provisions of the trust agreement are in substance: (1) that upon demand of Fort Totten, Inc., and payment to the Bank of $154.51 per lot unit for any of the lot units shown on Map No. 1 of the subdivision, the Bank as trustee should execute deeds conveying title to such persons as may be directed by Fort Totten, Inc. (2) The deeds to these lots "shall contain such building restrictions as may be directed by . . . Fort Totten, Inc." (3) The net proceeds of sale of these lots shall be paid to or for the use and benefit of E. H. Meadows and Mrs. Julia B. Jones in designated proportions. (4) As to the 7.3 acre Fort Totten open acreage area designated on the map as "Jones and Meadows Land," the trust agreement provides that it shall be held by the Bank for the sole use and benefit of Fort Totten, Inc., to be conveyed "as a whole or in parcels upon direction of Fort Totten, Inc.," upon the payment of $1,250 per acre or the proportionate part thereof for the fraction of an acre." As to this area, the trust agreement is silent respecting building restrictions.

8. On 10 November, 1926, by due corporate action of Fort Totten, Inc., a form contract, to be used in binding the sale of lots in the subdivision,

was agreed upon.    The form contract was printed and reads in part as
follows: ". . . said deed (the deed to be made pursuant to the terms of
the binder contract) *to contain certain restrictions applying to lots west
of Fort Totten Drive,* binding upon the purchaser, his heirs and assigns,
considered to be of advantage to residents of said suburb, as follows: . . .
7. None of said lots, *except certain of them that may be set apart for that
purpose* shall be sold or used for business purposes, and no building for
business purposes shall be erected on any such lots until plans have been
approved by Fort Totten, Inc."   (Italics added.)

MAP NO. 1

This is a copy of the map recorded with the trust agreement and power
of attorney in book 265 at pages 287 to 292.

9. Only one of these contracts (the one executed 30 July, 1929, to O. C. Crump conveying four lots in the subdivided area) was registered in the Public Registry of Craven County. However, many deeds conveying lots in the subdivided area recite "This deed is made pursuant to contract

MAP NO. 2

DE GRAFFENRIED PARK, NEW BERN, NORTH CAROLINA

This is a copy of the map which by fiat of the Clerk dated 18 November, 1926, was ordered registered. It appears to be registered in Map Book 1, p. 91.

made and entered into by and between said Fort Totten, Inc. and said (name of grantee) dated (date of contract)." All these deeds to which references are made in the record filed here appear to have been executed on or subsequent to 20 July, 1927.

10. At a meeting of the directors of Fort Totten, Inc., held 10 November, 1926, a contract with the Atlantic Coast Realty Company providing for the sale of lots in de Graffenried Park (the subdivided area) was approved. This contract, copy of which is recorded in the minutes of the corporate meeting (not in the Public Registry of the County) recites that "Fort Totten, Inc. has employed said Atlantic Coast Realty Company to sell lots in its subdivision according to a map showing said lots and streets prepared by Clodfelder & Schisler, Civil Engineers, . . . and . . . Atlantic Coast Realty Company has accepted said employment upon ·the following terms, to wit: Fort Totten, Inc. has caused said land to be laid off into lot units of a frontage of 25 feet and streets and will lay concrete sidewalks, pave streets, lay water mains and sewers, put in electric light lines and cause said utilities to be·connected with the utilities of the City of New Bern, etc. That part of the land upon which is situated the old fort shown on the map within lines marked 'Jones and Meadows Land,' not having been divided into lots and streets, *will be sold as a whole or in such parcels as may be agreed upon,* upon such terms and provisions as agreed upon for the sale of lots insofar as the same may be applicable; but no deed shall be delivered to purchasers until an amount equivalent to $1,250 per acre for 7.3 acres, plus 10% of the sale price shall have been paid." (Italics added.)

11. It further appears that after the first map was made—the one which was attached to and recorded with the trust agreement of 6 November, 1926—a second map was made. This second map by fiat of the Clerk of the Superior Court dated 18 November, 1926, was ordered registered, and it appears to have been registered in "Map Book 1, page 91." This map, copy of which marked "Map No. 2," appears herewith, page 507. The only material difference between the first and second maps is in respect to the 7.3 acre Fort Totten area. On the first map this area is designated "Jones and Meadows Land" and is wholly undivided, whereas on the second map it is partially subdivided.

12. On 15 January, 1931, the National Bank of New Berne having closed its doors and Fort Totten, Inc., having been placed in receivership, Mrs. Julia B. Jones and the other beneficiaries under the recorded trust agreement with the Bank, together with the Receiver of Fort Totten, Inc., and Virginia Trust Company as creditor, joined in the execution of a trust agreement under which John A. Guion was substituted as trustee in place of the defunct bank. This agreement is registered in the Register's office in Book 297, page 512. By the terms of this instrument, the

lands within this suburb, except the lots already sold, were conveyed to John A. Guion, Trustee, upon the following conditions and trusts, and for the following purposes, to wit: "I. As to that part of said land within the boundaries of the residential subdivision known as 'de Graffenried Park,' a map of which is duly registered in the office of the Register of Deeds of Craven County, N. C., in Map Book 1, page 91, (Map No. 2) which has been subdivided into lot units of an approximately uniform frontage, being all of the lots lying north of Neuse Boulevard and all of the lots lying west of Fort Totten Drive between Neuse Boulevard and Trent Boulevard, upon demand of Fort Totten, Inc., and the payment to the said trustee herein of the sum of $154.51 per lot unit for each, any or all of the lot units shown on the said map of said subdivision, the said trustee herein will and shall execute good and proper deeds conveying the same in fee simple to such persons as may be directed by Fort Totten, Inc., *which deeds shall contain such building restrictions as may be directed by said Fort Totten, Inc.* II. As to that part of said lands within the boundaries of 'de Graffenried Park,' as shown on the aforesaid map, lying east of Fort Totten Drive and between Neuse and Trent Boulevards, upon demand of Fort Totten, Inc., and payment therefor at the rate of $1,250 per acre, the said trustee herein will and shall execute good and proper deeds conveying the same as a whole or in such lots and parcels and to such person or persons as said Fort Totten, Inc. may designate." (Italics added.)

13. On 1 December, 1934, in the consolidated actions entitled Virginia Trust Company, E. H. Meadows and Mrs. Julia B. Jones, plaintiffs, v. E. M. Green, Receiver of Fort Totten, Inc., and John A. Guion, Trustee, Craven County and The National Holding Company, and others, a consent judgment was signed by Judge J. Paul Frizzelle, Resident Judge of the Fifth District. By this judgment the Receiver of Fort Totten, Inc. was authorized to sell the remaining lots and property shown on the maps, and to facilitate the sale, the release prices per unit were materially reduced. One portion of the lots formerly priced at $154.51 was reduced to $100, and another portion to $75.00; and the price of the 7.3 acre Fort Totten open acreage tract, previously fixed at $1,250 per acre, was reduced materially and made subject to subdivision into lots, to be released, if sold as so subdivided, on the basis of the acreage price as fixed. The judgment contained a proviso to the effect that the "Receiver is not authorized to sell the land within this area (the 7.3 acre Fort Totten area) until protective building restrictions and uses applying to the land within this area are agreed upon by Craven County, Virginia Trust Company and Mrs. Julia B. Jones."

14. "Craven County, Virginia Trust Company and Mrs. Julia B. Jones never agreed upon 'protective building restrictions and uses apply-

ing to the land' within this area" (the 7.3 acre area), although the deed from W. C. Chadwick, Receiver, and John A. Guion, Trustee, contained restrictive covenants as hereinafter appear in paragraph 17.

15. By order of Judge Sinclair entered in the Superior Court of Craven County 19 October, 1936, W. C. Chadwick, Receiver of Fort Totten, Inc., was authorized to sell and convey to Dixie Dairy Products, Inc., lots Nos. 7 and 8 in Block 11 as shown on the plat registered in Map Book 1 at page 91 (Map No. 2), for $2,500. This proposed sale for business purposes was never consummated, the reason being that the purchaser after making a cash payment of $500 failed to raise the balance of the purchase price. By order of court the purchaser was refunded part of the sum paid.

16. On 12 November, 1937, W. C. Chadwick, Receiver of Fort Totten, Inc., petitioned the court for approval of a contract with J. W. Ferrell Company for the auction sale of the remaining lots. Approval was obtained by order signed by Judge Frizzelle 27 November, 1937. The contract with Ferrell stipulated that "all lots sold to be subject to building restrictions and conditions heretofore provided for the development as contained in the conveyances heretofore made." The advertisements of sale published in the *New Bern Sun-Journal* indicate that sixty lots were offered for sale. The sale was conducted 30 November, 1937. The Receiver's report shows that "B. O. Jones, Trustee for Craven County," purchased the entire 7.3 acre Fort Totten tract at the price of $2,000. The report of sale was approved and confirmed by order of Judge W. C. Harris, Judge holding the courts of the Fifth Judicial District, dated 2 December, 1937.

17. By deed dated 30 November, 1937, and duly recorded in the Craven County Registry, W. C. Chadwick, Receiver of Fort Totten, Inc., and John A. Guion, Trustee, conveyed the 7.3 acre Fort Totten tract in bulk to "B. O. Jones, Trustee for Craven County." The *habendum* clause of this deed reads as follows: "To have and to hold the said lots or parcels of land unto the said party of the second part, his heirs and assigns, in fee simple forever, and said lots are conveyed upon and subject to the following conditions and restrictions, which said party of the second part, for his heirs and assigns, do agree and covenant shall be kept and performed, as they may be pertinent to the lots hereby conveyed, to wit: . . . 7. The lots hereby conveyed shall not be used for business purposes." The deed confers on B. O. Jones no duty to be performed as trustee.

18. The agreed statement of facts contains this recital: "November 30, 1937, by agreement made between B. O. Jones, Trustee for Craven County, and W. C. Chadwick, Mayor of the City of New Bern, the County agreed to sell to the City an undivided one-half interest in said land (the 7.3 acre Fort Totten tract) and said land was to be held for a

public park for white citizens of said City and County and for no other purpose until said City and County may both consent that said property or any part thereof may be used for other purposes or disposed of by sale or otherwise. See Record of Minutes Book C, page 640." The record is silent respecting (1) whether this contract was reduced to writing, or (2) if so, whether it was registered in the public registry of Craven County. However, the contract appears to have been approved by the County as shown by this excerpt from the minutes of a meeting of the board of commissioners held at an undisclosed time subsequent to the execution of the deed to Jones, Trustee for Craven County: "On motion duly made and carried a one-half undivided interest was sold to the City of New Bern for $1,000 in the following described property: All that block or parcel of land as shown on said map or plan of DeGraffenried Park, bounded on the north by Neuse Boulevard, on the west by Fort Totten Drive, on the south by Trent Boulevard, and on the east by the eastern property line of DeGraffenried Park, as shown on said map. It being the same tract or parcel of land conveyed to the party of the first part by deed of W. C. Chadwick, Receiver, and others, dated 30th day of November, 1937, and registered in the office of the Register of Deeds of said County in Book 328, page 528."

19. The agreed statement next discloses a deed dated 1 July, 1946, made by B. O. Jones, Trustee, to Craven County and the City of New Bern, embracing the entire 7.3 acre tract of Fort Totten lands. This deed, duly recorded in the Public Registry of Craven County, is a deed of bargain and sale, without the usual covenants of title and warranty. It recites a consideration of "one dollar and other good and valuable consideration" paid by the County and City. The *habendum* clause recites that the deed is made "upon the conditions set forth in the contract between said Jones and said City dated 30 Nov., 1937."

20. On 21 November, 1952, the City of New Bern and Craven County joined in the execution of a deed which is designated "deed of partition." This deed, duly registered, states that the City and County have agreed upon a division of the 7.3 acre tract of Fort Totten land, and contains reciprocal conveying clauses reciting in substance that each party releases and conveys to the other in severalty the share allotted to each. The County's designated share includes the lands involved in this action.

After this action was instituted, B. H. Baxter and three others, owners of lots in the subdivision, under leave of court intervened in the action on behalf of themselves and all other landowners similarly situated, and by answer denied plaintiff's allegation that the land sought to be conveyed to the defendant could be used for business purposes, and by affirmative defense alleged that the land was subject to valid restriction against such use of the property.

Upon the facts agreed, the court below, being of the opinion that the deed tendered by the plaintiff, Craven County, is sufficient to convey "a full fee simple interest in the lands in question to the defendant and that the defendant may use said lands for business purposes," entered judgment for the plaintiff.

From the judgment so entered, the defendant appeals.

*W. B. R. Guion* and *R. A. Nunn* for plaintiff, appellee.
*Ward & Tucker* for defendant, appellant.

JOHNSON, J. Is the land sought to be conveyed to the defendant, First-Citizens Bank & Trust Company, subject to a restrictive burden under which the Bank may be prevented from using the property for business purposes? This is the question presented by this appeal.

In the outset it is to be noted that the principle upon which these restrictive burdens on the use of lands within a real estate subdivision are enforceable is that they are servitudes imposed on the various lots or parcels for the benefit of the area affected. Such servitudes ordinarily are treated as easements appendent or appurtenant to the various lots or parcels within the restricted area. The existence of two estates in land is required to support an easement of this sort. On the one hand is the estate which bears the burden—the servient tenement; on the other is the estate which derives the benefit—the dominant tenement. The one owes, whereas the other is owed the obligation. Tiffany, Law of Real Property, Third Edition, Sec. 758; Clark, Covenants and Interests Running with Land, Second Edition, p. 1134; Mordecai's Law Lectures, Second Edition, pp. 469-470.

These servitudes, commonly referred to as negative easements, are usually imposed by restrictive covenants between the developer and the initial purchasers and become seated in the chain of title so that subsequent purchasers are chargeable with notice thereof (*Turner v. Glenn*, 220 N.C. 620, 18 S.E. 2d 197), thus fixing it so each lot in a legal sense owes to all the rest of the lots in the subdivision the burden of observing the covenant, and each of the rest of the lots is invested with the benefits imposed by the burdens. Accordingly, in legal contemplation the servitude imposed on each lot runs to and attaches itself to each of the rest of the lots in the restricted area, thus forming a network of cross-easements or cross-servitudes, the aggregate effect of which is to impose and confer on each lot reciprocal and mutual burdens and benefits appurtenant to the lots, so as to run with the land and follow each lot upon its devolution and transfer. Thompson on Real Property, Permanent Edition (1940), Vol. 7, Sec. 3631; 14 Am. Jur., Covenants, etc., Sections 193 and 194.

Therefore, where land within a given area is developed in accordance with a general plan or uniform scheme of restriction, ordinarily any one purchasing in reliance on such restriction may sue and enforce the restriction against any other lot owner taking with record notice, and this is so regardless of when each purchased; and similarly, a prior taker may sue a latter taker. *Johnston v. Garrett,* 190 N.C. 835, 130 S.E. 835; *Homes Co. v. Falls,* 184 N.C. 426, 115 S.E. 184; 26 C.J.S., Deeds, Sec. 167; Tiffany, Law of Real Property, Third Edition, Chapters 17 and 18, p. 441 *et seq.;* Clark, Covenants and Interests Running with Land, Chapter 6, p. 170 *et seq.*

The right of action rests upon the principle that a negative easement of this sort is a property right amounting to an interest in land. *City of Raleigh v. Edwards,* 235 N.C. 671, 71 S.E. 2d 396; *Turner v. Glenn, supra; Davis v. Robinson,* 189 N.C. 589, 127 S.E. 697.

Decision here does not require a detailed discussion of the procedural requirements necessary to be followed in order to impose restrictive servitudes on a given area of land. The minimum procedural requirements necessary to impose such burdens have been delineated and fully explained in numerous decisions of this Court, among which are these: *East Side Builders v. Brown,* 234 N.C. 517, 67 S.E. 2d 489; *Sedberry v. Parsons,* 232 N.C. 707, 62 S.E. 2d 88; *Higdon v. Jaffa,* 231 N.C. 242, 56 S.E. 2d 661; *Turner v. Glenn, supra; Humphrey v. Beall,* 215 N.C. 15, 200 S.E. 918; *Davis v. Robinson, supra; Snyder v. Heath,* 185 N.C. 362, 117 S.E. 294; *Homes Co. v. Falls, supra; Stephens Co. v. Homes Co.,* 181 N.C. 335, 107 S.E. 233.

It suffices here to say that our decisions emphasize these factors: (1) that to be effective the restrictive covenant sought to be enforced must be part of a general plan or scheme of development which bears uniformly upon the area affected (*Sedberry v. Parsons, supra; Humphrey v. Beall, supra*); and (2) that where an entire tract is developed over an extended period of time, and the intent clearly appears, as disclosed by the record chain of title, that the restrictions were imposed by the developer in accordance with a plan of development by separate, distinct divisional units within the larger area, rather than as a single development project, effect will be given to restrictive covenants only as they relate to each such separate unit. *Stephens Co. v. Homes Co., supra; Homes Co. v. Falls, supra; Snyder v. Heath, supra; Higdon v. Jaffa, supra; East Side Builders v. Brown, supra.* See also *Besch v. Hyman,* 223 N.Y.S. 231, 221 App. Div. 455; *Russell Realty Co. v. Hall* (Texas), 233 S.W. 996.

Further, it is to be noted that we adhere to the rule that these restrictive servitudes being in derogation of the free and unfettered use of land, the covenants imposing them are to be strictly construed in favor of the

unrestricted use of property. *Davis v. Robinson, supra.* See also 14 Am. Jur., Covenants, etc., Sec. 212.

It seems to have been assumed below that the main body of the land lying west of Fort Totten Drive and north of Neuse Boulevard is subject to negative easements, imposed pursuant to a general plan or uniform scheme of development, which confer upon the owners of these lots reciprocal rights to prevent the use of any of them for business purposes. *Humphrey v. Beall, supra; Sedberry v. Parsons, supra.*

Conceding, without deciding, that such is the status of the title to the lots within this area, nevertheless decision here requires that we determine the question whether or not these easements or restrictive servitudes reach across Fort Totten Drive and attach to any part of the 7.3 acre tract. The determination of this question is dependent largely upon whether the developers of this property treated and dealt with the two areas as a single unit and intended the restrictive easements to cover both tracts, or whether the two areas were treated and dealt with as separate, independent units, with intent of the developers and purchasers that the restrictions imposed be limited to the area west of Fort Totten Drive and north of Neuse Boulevard. This intent is to be gathered from the terms of the covenants and related facts appearing in the chain of title. It may not be established by parol. *Turner v. Glenn, supra; Davis v. Robinson, supra.*

The record here discloses these crucial facts bearing on the question at hand: (1) The original map of the subdivision shows the 7.3 acre Fort Totten tract left as open acreage designated as "Jones and Meadows Land," whereas the large area west of Fort Totten Drive and north of Neuse Boulevard is divided into streets, lots, and so forth. (2) The trust agreement executed 6 November, 1926, by the Bank as trustee stipulates in effect that building restrictions to be directed by Fort Totten, Inc., shall be imposed on the subdivided area west of Fort Totten Drive and north of Neuse Boulevard, whereas the 7.3 acre tract designated "Jones and Meadows Land" is to be conveyed as a whole or in parcels as directed by Fort Totten, Inc., with no reference being made to restrictions on this area. (3) The printed form contract approved by Fort Totten, Inc., and used in selling the lots expressly recites that the designated restrictions apply "to lots west of Fort Totten Drive." (4) The instrument dated 15 January, 1931, substituting John A. Guion as trustee in place of the defunct bank, reiterates that the lots "west of Fort Totten Drive . . ." shall contain building restrictions, and leaves the area east of the Drive to be sold as acreage, with no mention being made of restrictions. (5) On 27 November, 1937, Judge Frizzelle entered an order approving the proposed contract made by the Receiver of Fort Totten, Inc., with J. W. Ferrell Company for the sale of the remaining lots. This contract, em-

bracing lots in both areas, stipulates that "all lots sold to be subject to building restrictions heretofore provided for the development as contained in the conveyances heretofore made." At the sale conducted pursuant to the contract, "B. O. Jones, Trustee for Craven County," became the purchaser of the entire 7.3 acre area for the price of $2,000, and the report of sale "was approved and confirmed" by Judge Harris, and the record here discloses no reference to restrictions in the order of confirmation.

These and other related facts disclosed by the record impel the conclusion that for restrictive use purposes the large suburban development west of Fort Totten Drive and north of Neuse Boulevard was treated and dealt with by the developers and purchasers of this property as being entirely separate from the 7.3 acre Fort Totten area east of the Drive. The record effectively negatives the suggestion that the parties intended the restrictions imposed on the lots in the larger area to extend to the neighboring 7.3 acre parcel.

We have not overlooked the consent judgment entered 1 December, 1934. This judgment reduced the sale price of the unsold property and authorized the Receiver of Fort Totten, Inc., to sell the remaining lots on both sides of Fort Totten Drive at any time within three years. The judgment provides that the Receiver may not sell the lots in the 7.3 acre area "until protective building restrictions . . . applying to this area are agreed upon by Craven County, Virginia Trust Company and Mrs. Julia B. Jones." As to this, it is suggested by the defendant that presumptively it was the restrictive covenant promulgated by these parties that was placed in the deed by which the Receiver and the Trustee conveyed the entire 7.3 acre tract to B. O. Jones, Trustee for Craven County, and that this deed effectively tied the two areas together as one for restrictive use purposes. The contention presents a close question. However, it may not be sustained in the light of these factors which we think effectively negative the idea of the presumption relied on by the defendant: (1) A contextual examination of the judgment discloses that in reducing the sale price of the various lot units and in giving the Receiver leave to sell within the three-year period the unsold portions of the property at the prices fixed in the judgment for each unit, it was contemplated that the Receiver should sell the lots, including those in the 7.3 acre area, piece by piece (or by the acre in the latter area), at private sales over a period of time; (2) that in the event of such sale in parcels of the 7.3 acre tract, it was left open in respect thereto for the three designated parties; namely: Craven County, Virginia Trust Company, and Mrs. Julia B. Jones, to devise satisfactory restrictions to be imposed on the 7.3 acre area, not for the benefit of the larger area, but as applicable to and for the benefit of the lot units in the 7.3 acre tract. (3) As it turned out, the

Receiver was unable to sell any part of the lots in the 7.3 acre Fort Totten tract, and therefore there was no reason for the three designated parties to agree upon or promulgate restrictions to be imposed on the lots in this area, and on the record as presented these parties never met and affirmatively adopted any restrictive covenants to be imposed on these lots. (4) On failure of the Receiver to dispose of the lots by the parcel, Craven County as moving party contacted J. W. Ferrell and arranged for an auction sale of the unsold lots in both areas. A contract with Ferrell ensued. The contract was approved by order of the court dated 27 November, 1937. The contract as approved provides that the lots shall be sold in accordance with restrictive covenants provided in "conveyances heretofore made." The record shows that no restrictions were imposed on the 7.3 acre tract by these prior "conveyances." At the Ferrell auction sale the entire 7.3 acre area was sold in bulk and so conveyed to Jones, Trustee for Craven County. It thus appears that the court order of 27 November, 1937, also signed by Judge Frizzelle, supersedes the prior judgment of 1 December, 1934, with respect to restrictive covenants.

The record as presented sustains the lower court's conclusion that the two tracts stand as separate and distinct development units; and the servitudes imposed within the area west of Fort Totten Drive and north of Neuse Boulevard do not run to or attach themselves upon any part of the 7.3 acre Fort Totten tract.

Next, it is contended by the defendant that the deed by which the 7.3 acre Fort Totten tract was conveyed to B. O. Jones, Trustee for Craven County, imposed on that tract, treating it as a separate unit, a negative easement prohibiting its use for business purposes. It is noted that this deed—a mimeographed form similar to those used in conveying lots in the residential district west of Fort Totten Drive—contains the same restrictive covenants appearing in those deeds, including this one: "7. The lots hereby conveyed shall not be used for business purposes."

The contention is without merit. It is settled law that a real covenant imposing a servitude on land is coextensive only with the estate to which it is annexed. 14 Am. Jur., Covenants, etc., Sec. 5. This being so, a real covenant imposing a servitude which runs with land loses its character as such and the servitude is extinguished when all the land affected by the covenant becomes vested in one and the same person. This in legal contemplation works a dissolution of the servient and dominant tenements. By merger both are swallowed up in the single ownership. *Spector v. Traster,* 270 Mass. 545, 170 N.E. 567; *Stevenson v. Spivey,* 132 Va. 115, 110 S.E. 367; 14 Am. Jur., Covenants, etc., Sections 291 and 293.

Similarly, and under application of these principles, where, as in the instant case, a deed containing a covenant restricting the use of land embraces and conveys all the land affected thereby, such covenant stands

only as a personal covenant between the parties. And a personal covenant (as distinguished from a real covenant) by its very nature does not run with the land. Thompson on Real Property, Permanent Edition (1940), Vol. 7, Sec. 3632; 14 Am. Jur., Covenants, etc., Sec. 19 *et seq.;* 26 C.J.S., Deeds, Sec. 167. See also *Taylor v. Lanier,* 7 N.C. 98; *Blount v. Harvey,* 51 N.C. 186; *Weisman v. Smith,* 59 N.C. 124; *Ricks v. Pope,* 129 N.C. 52, 39 S.E. 638; *Phillips v. Wearn,* 226 N.C. 290, 37 S.E. 2d 895.

Therefore, the covenants in the deed to Jones, Trustee for Craven County, stipulating that 7.3 acre Fort Totten tract shall not be used for business purposes, may not be enforced as a real covenant or treated as imposing a negative easement on the land. *Los Angeles Terminal Land Co. v. Muir,* 136 Cal. 36, 68 P. 308; *Mitchell v. Leavitt,* 30 Conn. 587; *Lowell Inst. for Sav. v. Lowell,* 153 Mass. 530, 27 N.E. 518; *Badger v. Boardman,* 82 Mass. 559; *Jewell v. Lee,* 96 Mass. 145.

Moreover, this covenant is unenforceable even as a personal covenant between the parties to the deed. This because neither of the grantors had the legal authority to make any such covenant. Chadwick, Receiver, derived his authority and power from the judgment of Judge Frizzelle, dated 27 November, 1937, approving the contract with Ferrell for an auction sale of all the unsold lots in both development units. The record indicates that the contract as approved directed that the lots be sold subject to building restrictions "contained in conveyances heretofore made." An examination of the "conveyances heretofore made" discloses that no restrictions were imposed on the 7.3 acre Fort Totten tract. Therefore, the Receiver was without authority to impose burdens on this tract. As to Guion, Trustee, it is apparent from the record that his power derived from the indenture of 15 January, 1931, substituting him as trustee in place of the defunct bank. This instrument, executed by all the beneficial owners of the lands, expressly provides that the lots in the residential development west of Fort Totten Drive and north of Neuse Boulevard shall be conveyed subject to restrictions as to use, whereas it is directed that the 7.3 acre tract east of the Drive be sold as a whole or in parcels, with the clear implication being that this tract is treated as a separate unit to be sold without restrictions as to use. It is obvious, therefore, that since neither Chadwick, Receiver, nor Guion, Trustee, had legal authority to limit the use of the property conveyed, the covenant inserted in the deed is a nullity as to both these grantors and may not be enforced by either of them or by anyone claiming through or under them. *Trust Co. v. Refining Co.,* 208 N.C. 501, 181 S.E. 633; *Johnson v. Lumber Co.,* 225 N.C. 595, 35 S.E. 2d 889; 54 Am. Jur., Trusts, Sec. 440.

Nor is there any merit in the defendant's contention that the subsequent conveyances made by Jones, Trustee, and by the City and County activated the restrictive covenant contained in the deed to Jones, Trustee,

and imposed its burden on the land as a negative cross-easement when the ownership of the 7.3 acre tract became divided between the City and County. Here the defendant urges in gist that when the ownership became divided between the City and County, such divided ownership activated the covenant, brought into existence reciprocal servient and dominant tenements, and thus imposed the burdens of the covenant upon both parcels of the land.

As to this contention, it is observed that none of the deeds appearing in the chain of title subsequent to the deed to B. O. Jones, Trustee for Craven County, contains any reference to the so-called restrictive covenant which appears in that deed. As we have seen, the deed to Jones, Trustee for Craven County, created no easement and imposed no burden on the land. Therefore, when the land was first conveyed thereafter by deed containing no reference to or mention of the covenant respecting restriction as to use, such noninclusion of the covenant and silence of the parties in respect thereto worked an effective abandonment and disavowal of the provisions of the covenant contained in the deed to Jones, Trustee for Craven County.

The defendant makes the further contention that title to the lot sought to be conveyed to the defendant bank is defective for that when the 7.3 acre Fort Totten tract was partitioned between the City and County, the partition was made without public notice as required by G.S. 160-59, and that therefore the City's interest in the lot in question has not been released according to the formalities of law. The contention is without merit. This statute requires public notice only in respect to the sale of real estate belonging to a municipality. It has no application to actual partition of land in which a municipality owns an interest. Actual partition between tenants in common involves no sale or disposal of land or any interest therein. It creates no new, different, or additional title or estate in land. It only severs the unity of possession. *Wood v. Wilder,* 222 N.C. 622, 24 S.E. 2d 474; *Wallace v. Phillips,* 195 N.C. 665, 143 S.E. 244.

Besides, it is only by virtue of facts resting in parol, apparently conceded by the defendant in the facts agreed, that the City ever occupied, if indeed it did, the position of a tenant in common with the County in respect to the parcel of land in controversy. As to this, it is noted that the deed made by Chadwick, Receiver, and Guion, Trustee, to B. O. Jones, Trustee for Craven County, confers on Jones no duty as such trustee. Therefore, on the record title as here presented the deed created a passive (as distinguished from an active) trust, the immediate effect of which, by operation of our Statute of Uses, G.S. 41-7, was to place in Craven County the whole title to the land—the legal as well as the equitable title. 2 Blackstone, p. 333; *Pippin v. Barker,* 233 N.C. 61, 62 S.E. 2d 520; *Fisher v. Fisher,* 218 N.C. 42, 9 S.E. 2d 493, and cases there cited; *Lee*

*v. Oates,* 171 N.C. 717, 88 S.E. 889; *Springs v. Hopkins,* 171 N.C. 486, 88 S.E. 774.

It follows from what we have said that the judgment below is
Affirmed.